UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

LORRAINE FESTA,

                    Plaintiff,

        v.                                      No. 18-CV-1335 (KMK)

WESTCHESTER MEDICAL CENTER                      OPINION & ORDER
HEALTH NETWORK, d/b/a
WESTCHESTER COUNTY HEALTH
CORPORATION; and MICHAEL D.
ISRAEL, sued in his individual capacity,

                    Defendants.
────────────────────────────────

Appearances:

Raphael Katz, Esq.
Sadowski Katz LLP
New York, NY
*Counsel for Plaintiff*

Stephen Bergstein, Esq.
Bergstein & Ullrich, LLP
New Paltz, NY
*Counsel for Plaintiff*

Daniel David Schudroff, Esq.
Arielle Virginia Garcia, Esq.
Jackson Lewis P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Lorraine Festa ("Plaintiff") brings this Action under the First Amendment of the U.S.

Constitution, U.S. Const. amend. I, against Westchester Medical Center Health Network, d/b/a

Westchester County Health Care Corporation ("WCHCC"), and Michael D. Israel in his

individual capacity ("Israel") (collectively, "Defendants"). (*See* Compl. (Dkt. No. 1).) Plaintiff

alleges that Defendants violated her rights under the First Amendment when they terminated her

employment because of an anti-Semitic Facebook post.  (*See* Compl. ¶¶ 1, 14.)  Before the Court is Defendants' Motion To Dismiss (the "Motion").  (*See* Not. of Mot. ("Defs.' Mot.") (Dkt. No. 17).)  For the following reasons, the Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Complaint, and are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a 55-year-old woman who resides in Lagrangeville, New York.  (Compl. ¶ 2.)  On October 27, 2015, Plaintiff began working at Westchester Medical Center ("WMC"), which is operated by Defendant WCHCC, as a compliance coordinator.  (*Id.* ¶¶ 3, 4, 8.)[1]  Plaintiff's duties included compliance oversight for three "Bon Secours" acute care hospitals, three nursing homes, and one assisted living facility.  (*Id.* ¶ 9.)  In December 2016, Plaintiff received a performance review, which concluded that her performance "meets expectations," and described Plaintiff as "a pleasure to work with and . . . a very vital member of [the] team."  (*Id.* ¶ 10.)

On the evening of June 19, 2017, while at home, Plaintiff logged onto Facebook on her personal computer and saw a weather report on a local news organization's Facebook page that discussed a "funnel cloud" projected to affect the village of Kiryas Joel, "a predominantly Hasidic community in Orange County."  (*Id.* ¶¶ 11–12.)[2]  In the public comment section of the

---

[1] WCHCC is a public benefit corporation created by the New York State legislature that operates WMC.  *See* N.Y. Pub. Auth. Law §§ 3301, 3303.

[2] "Facebook is a worldwide social networking company that, inter alia, allows users to share content with other users."  *Dollar Tree Stores, Inc. v. Serraty*, No. 16-CV-6818, 2018 WL 1180165, at *1 (E.D.N.Y. Feb. 14, 2018), *adopted by* 2018 WL 1175159 (E.D.N.Y. Mar. 6, 2018).

weather report, Plaintiff wrote, "[t]oo bad it didn't suck them all away!"  (*Id.* ¶ 13; Compl. Ex. 1 ("Facebook Post").)

The next day, Kim Herkeler ("Herkeler"), a human resources manager, informed Plaintiff that Defendant Israel had decided to terminate Plaintiff's employment because of "an anti-Semitic online post," noting that "someone had called the Hospital to complain about Plaintiff's Facebook comment."  (Compl. ¶ 14.)  Plaintiff contacted Valerie Campbell ("Campbell"), regional senior director of compliance for WMC, who told Plaintiff "that she was fired over the Facebook post and not her job performance."  (*Id.* ¶ 15.)  Plaintiff asserts that her message was "not intend[ed] to convey an anti-Semitic message . . . [or] to offend anyone."  (*Id.* ¶ 16.)  Plaintiff states that she has been unable to find comparable employment since her termination, and has "endured emotional pain and suffering."  (*Id.* ¶¶ 19–20.)

Plaintiff contends that her Facebook post was protected by the First Amendment because, as "off-duty speech," it "could not reasonably have been interpreted as disrupting the workplace."  (*Id.* ¶ 17.)  Plaintiff also asserts that as Chief Executive Officer ("CEO") and President of WMC, Israel "is a municipal policymaker on personnel-related matters," and that his actions are therefore attributable to WCHCC "for purposes of *Monell* liability."  (*Id.* ¶ 18.)  Plaintiff seeks compensatory and punitive damages, attorneys' fees and costs, and injunctive relief in the form of reinstatement to her position of employment "or to a comparable position."  (*Id.* at 4–5.)

B.  Procedural Background

Plaintiff filed her Complaint on February 14, 2018.  (*See* Compl.)  On March 14, 2018, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss.  (Dkt. No. 11.)  The Court held a pre-motion conference on May 3, 2018, at which the

Court set a briefing schedule for Defendants' Motion. (*See* Dkt. (minute entry for May 3, 2019); Motion Scheduling Order (Dkt. No. 15).)

Defendants filed the instant Motion To Dismiss and accompanying papers on June 15, 2018. (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 18).) On July 20, 2018, Plaintiff filed a response. (*See* Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 21).) On August 17, 2018, Defendants filed a reply. (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 22).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted).

<u>B. Analysis</u>

Defendants move to dismiss the Complaint on grounds that Plaintiff has failed to state a claim, that Plaintiff has failed to establish municipal liability, and that Israel is entitled to qualified immunity. (*See* Defs.' Mem 4–18.)

1. Plaintiff's First Amendment Retaliation Claim

a. Applicable Law

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (citation and quotation marks omitted). "[T]he First Amendment inquiry must proceed in two parts. 'The first component requires determining whether the employee spoke as a citizen on a matter of public concern.'" *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018) (alteration omitted) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Matthews*, 779 F.3d at 172 ("A court conducts a two-step inquiry to determine whether a public employee's speech is protected: 'The first requires determining whether the employee spoke as a citizen on a matter of public concern.'" (quoting *Garcetti*, 547 U.S. at 418)). This first step involves "two inquiries": "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420–22). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 547 U.S. at 418).

> If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis:

whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'

*Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 573 U.S. 228, 237 (2014)); *see also Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) ("[W]e ask first whether the employee's expressive conduct was speech as a citizen on a matter of public concern. If the answer is yes, then the possibility of a First Amendment claim arises. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." (quotation marks omitted) (citing *Garcetti*, 547 U.S. at 418)). There are "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech falls outside of the employee's official responsibilities, and (2) whether a civilian analogue exists." *Montero*, 890 F.3d at 397 (citation, quotations marks, and alterations omitted). "Although the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, the critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id.* at 397–98 (citing *Lane*, 573 U.S. at 240); *see also Butts v. N.Y.C. Dep't of Educ.*, No. 16-CV-5504, 2018 WL 4725263, at *5 (E.D.N.Y. Sept. 28, 2018) (noting that the second inquiry "is not dispositive" and "the first inquiry is the critical one" (citing *Montero*, 890 F.3d at 397–98)).

The *Pickering* analysis, established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), requires the Court to "seek a balance between the interests of the employee, as a citizen, in commenting upon matter of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (citation, alteration, and quotation marks omitted). "In the *Pickering* balancing analysis, 'the state's burden in justifying a particular discharge varies

depending upon the nature of the employee's expression.'" *Jackler*, 658 F.3d at 237 (quoting *Connick*, 461 U.S. at 150). "Justifications may include such considerations as maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." *Piscottano*, 511 F.3d at 271. "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Jackler*, 658 F.3d at 237 (quoting *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999)). "The weighing of the competing interests is a matter of law for the court." *Id.*; *see also Jean-Gilles v. County of Rockland*, 463 F. Supp. 2d 437, 450 (S.D.N.Y. 2006) ("[T]his balancing of interests . . . poses a question of law for the court.").

"Evidence that such harms or disruptions have in fact occurred is not necessary. The employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano*, 511 F.3d at 271. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. However, in order for Defendants to meet their burden justifying Plaintiff's discharge, there must be a "demonstrated nexus between the employee's speech and the employer's operations." *Piscottano*, 511 F.3d at 271. "Where there is no such nexus, the state's interest as an employer is not implicated, and restrictions on the employee's speech will be subjected to the same scrutiny given to restrictions imposed on citizens' speech by the state as sovereign." *Id.* (citing *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 465–66 (1995)).

Moreover, the Second Circuit has stated it is "sensible" to "treat off-duty, non-work-related speech as presumptively entitled to First Amendment protection regardless of whether, as

a threshold matter, it may be characterized as speech on a matter of public concern." *Locurto v. Giuliani*, 447 F.3d 159, 175 (2d Cir. 2006); *cf. Jean-Gilles*, 463 F. Supp. 2d at 450 ("If the plaintiff can demonstrate his speech centered on a matter of public concern—or if the plaintiff's speech concerned off-duty speech unrelated to his employment—the court must balance the parties' competing interests."). "[T]he closeness of a Government employee's off-duty, non-work-related speech to the heart of the First Amendment then becomes relevant as part of the *Pickering* balancing test, to be weighed against the Government's interest only after the Government meets its burden of identifying a reasonable potential for disruption." *Locurto*, 447 F.3d at 175 (emphasis omitted). Where a plaintiff's comments "at most only minimally touch on matters of public concern . . . [,] the government's burden, at the balancing stage, is at its lowest." *Blackman v. N.Y.S. Transit Auth.*, 491 F.3d 95, 99 (2d Cir. 2007).

### b. Application to Plaintiff's Claim

The Parties agree that Plaintiff's speech did not touch on a matter of public concern. (*See* Defs.' Mem. 13–14; Pl.'s Mem. 12–18 (arguing that Plaintiff need not demonstrate that her speech involved a matter of public concern).) Additionally, no Party argues that Plaintiff's speech was on the subject of her employment or her employer. Plaintiff nonetheless argues that her speech was protected as "off-duty, non-work-related speech." (Pl.'s Mem. 8 (quoting *Locurto*, 447 F.3d at 175).) Plaintiff characterizes off-duty speech unrelated to employment as entitled to "enhanced speech rights," (*id.* at 9), and argues that the government employer must therefore "show a stronger justification than the usual *Pickering* test" for the adverse employment action, (*id.* at 14). Plaintiff cites *City of San Diego v. Roe*, 543 U.S. 77 (2004) and *NTEU* for the proposition that the Supreme Court has designated two different categories of speech subject to different justification burdens: speech that touches on a "public concern" is

subject to the *Pickering* analysis, while off-duty speech unconnected to employment subjects the employer to a "heightened burden." (*Id.* at 14, 18.)

Plaintiff misstates the law. While some courts have extended First Amendment protection to off-duty speech unrelated to a plaintiff's employment, those courts have indicated that the off-duty speech is subject to the same *Pickering* analysis as speech pertaining to an issue of public concern. *See Jean-Gilles*, 463 F. Supp. 2d at 450 ("If the plaintiff can demonstrate his speech centered on a matter of public concern—or if the plaintiff's speech concerned off-duty speech unrelated to his employment—the court must balance the parties' competing interests."). Plaintiff's reliance on *NTEU* as establishing a higher burden is misplaced. There, the Supreme Court noted that the Government's burden was "greater" than the typical case specifically because the *NTEU* Court was evaluating the validity of a statute that would serve as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," rather than a "post hoc analysis of one employee's speech," and because "unlike an adverse action taken in response to actual speech, [the statute] chills potential speech before it happens." *NTEU*, 513 U.S. at 467–68; *see also Latino Officers Ass'n v. City of New York*, No. 97-CV-1384, 1997 WL 473972, at *3 (S.D.N.Y. Aug. 19, 1997) (noting that "the government bears a particularly heavy burden in this balancing test where the issue is a regulation which prospectively burdens a broad category of speech by a large number of potential speakers" (alterations and quotation marks omitted) (citing *NTEU*, 513 U.S. at 468)). Plaintiff's reliance on *Roe* is similarly misplaced; the *Roe* Court found the plaintiff's conduct, which included selling sexually explicit video footage of himself in his police uniform, was not entitled to protection because it did not touch on any matter of public concern, and because although it "was not a comment on the workings or functioning of the [police department]," it was "contrary to its

regulations and harmful to the proper functioning of the police force." *Roe*, 543 U.S. at 81–82. Foreshadowing the Second Circuit's holding in *Locurto*, the *Roe* Court thus found that off-duty speech unrelated to work that has the potential to impede the ability of a government entity to function effectively is unworthy of protection.

Although the Second Circuit in *Locurto* did not ultimately reach the issue of whether the plaintiffs' off-duty speech would have been protected if it had not touched on an issue of public concern, it is nevertheless instructive. In *Locurto*, former New York City police officers and firefighters sued the city of New York and several government officials claiming they were fired in violation of the First Amendment after participating in a Labor Day parade on a float that featured mocking stereotypes of African-Americans. *See Locurto*, 447 F.3d at 163. After noting that "the *Roe* Court's treatment of off-duty speech that is 'detrimental to the mission and functions of the employer' as 'outside the protection afforded in [*NTEU*]' underscores the fact that the public concern test does not apply neatly as a threshold test for expression unrelated to Government employment," *Locurto*, 447 F.3d at 174 (quoting *Roe*, 543 U.S. at 82, 84), the Second Circuit observed, without holding, that off-duty, non-work-related speech "is more sensibl[y]" treated as "presumptively entitled to First Amendment protection," *id.* at 175. However, the Second Circuit concluded that it "need not today decide and hence do not resolve whether it was necessary for the plaintiffs to satisfy the public concern test as a threshold matter," and instead assumed the plaintiffs' speech related to a matter of public concern and applied the *Pickering* balancing analysis. *Id.* The Second Circuit then held that the defendants were "motivated by a reasonable concern for the potentially disruptive effects of the plaintiffs' actions," and that "the defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive

interests." *Id.* at 183. The Court concluded, "one's right to be a police officer or firefighter who publicly ridicules those he is commissioned to protect and serve is far from absolute." *Id.* Rather, "it is tempered by the reasonable judgment of his employer as to the potential disruptive effects of the employee's conduct on the public mission of the police and fire departments." *Id.*

The Second Circuit's reasoning in *Locurto* is applicable here. As in *Locurto*, even assuming arguendo that Plaintiff's Facebook post was protected by the First Amendment, Defendants' "reasonable concern for the potentially disruptive effects" of her speech could outweigh Plaintiff's expressive interest. *Id.* Plaintiff works for a public hospital, the mission of which is to provide healthcare services to the local community. *See* N.Y. Pub. Auth. Law § 3301 (describing WCHCC's purpose as "provid[ing] health care services and health facilities for the benefit of the residents of the state of New York and the county of Westchester, including persons in need of health care services without the ability to pay as required by law"). Like police and fire services, an effective public hospital therefore "presupposes respect for the members of [its] communit[y]," and as an employer, the hospital is "permitted to account for this fact in disciplining" employees. *Locurto*, 447 F.3d at 182–83 (finding that "concern for the potential disruption" caused by "engendering and perpetuating a public perception of [the police and fire departments] as racially insensitive" was a reasonable motive for the defendants to terminate the plaintiffs' employment). "Where a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations." *Id.* at 179; *see also Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002) ("The effective functioning of entities of government could be seriously undermined by its employees' unrestrained declarations of their views. For this reason, the employee's right of free speech is

sometimes subordinated to the interest of the effective functioning of the governmental employer."). In such cases, an adverse employment action will be upheld if: "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Locurto*, 447 F.3d at 172–73; *see also Donovan v. Inc. Vill. of Malverne*, 547 F. Supp. 2d 210, 217 (E.D.N.Y. 2008) (explaining that a defendant can defeat a First Amendment retaliation claim if "the defendant can show that the employee's speech was likely to sufficiently disrupt government activities so as to outweigh the First Amendment value of the plaintiff's speech").

Courts have extended this reasoning to a variety of government employers, whose effectiveness relies on maintaining positive relationships with the communities they serve. *See, e.g.*, *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 198 (2d Cir. 2003) (finding that the plaintiff's position as a public school teacher "by its very nature requires a degree of public trust not found in many other positions of public employment"); *Pappas*, 290 F.3d at 146 ("The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias."); *Anemone v. Metro. Transp. Auth.*, No. 05-CV-3170, 2008 WL 1956284, at *13 (S.D.N.Y. May 2, 2008) (finding that public transit authority's decision to terminate an employee was reasonable where he made public statements to a reporter that would affect "the public's perception of the MTA"), *aff'd*, 629 F.3d 97 (2d Cir. 2011); *accord Weicherding v. Riegel*, 981 F. Supp. 1143, 1148 (C.D. Ill. 1997) (finding that "[c]orrectional facilities and their officers have a responsibility to operate the correctional facility in a safe manner" and that "the perception by the inmates and the community regarding the

philosophy of the correctional facility is crucial"), *aff'd*, 160 F.3d 1139 (7th Cir. 1998); *Pereira v. Comm'r of Soc. Servs.*, 733 N.E.2d 112, 122 (2000) (reversing summary judgment for the plaintiff, a Department of Social Services investigator, because such "investigators must both be and be perceived to be impartial and fair," and the plaintiff's "'racist' comment [made at a public event] . . . undermined those goals"); *cf. Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.").  This reasoning is equally applicable to public hospitals, which communities rely on to provide effective, comprehensive healthcare to all who seek its services, regardless of race, gender, religion, or any other characteristic.  Indeed, communities quite literally entrust public hospitals with matters of life and death.  It is not unreasonable for WCHCC to have considered Plaintiff's statement, which implied that she hopes a predominantly Hasidic community is swept away by inclement weather, disruptive to its ability to serve the community.

Furthermore, Plaintiff's statement can arguably "have a great capacity to cause harm within the ranks of [WCHCC's employees] by promoting resentment [and] distrust."  *Pappas*, 290 F.3d at 147.  Hospital employees work in a high-stress environment that requires them to work together seamlessly to handle medical emergencies, care for sick patients, and save lives.  It would not be unreasonable for Defendants to have determined that Plaintiff's co-workers could eventually learn about the anti-Semitic post on a public Facebook page for a local news source, and to have considered this when terminating Plaintiff's employment.  *See Waters*, 511 U.S. at 673 ("[W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern . . . ."); *Connick*, 461

U.S. at 151–52 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."); *Locurto*, 447 F.3d at 182 ("The Supreme Court has said that '[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. . . . [W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" (quoting *Connick,* 461 U.S. at 151–52)); *see also Grutzmacher v. Howard County*, 851 F.3d 332, 345 (4th Cir. 2017) ("To demonstrate that an employee's speech impaired efficiency, a government employer need not prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be apprehended." (citation and quotation marks omitted)).

Importantly, "[e]vidence that . . . harms or disruptions have in fact occurred is not necessary. The employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano*, 511 F.3d at 271; *see also Pappas*, 290 F.3d at 151 ("The employer's interest in discharging the employee is demonstrated if the employee's statements create a significant risk of harm, regardless whether that harm actually materializes."); *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995) ("[E]ven when the speech is squarely on public issues—and thus earns the greatest constitutional protection—*Waters* indicates that the government's burden is to make a substantial showing of *likely* interference and not an *actual* disruption." (citing *Waters*, 511 U.S. at 674–75)); *Weingarten v. Bd. of Educ. of City Sch. Dist. of City of New York*, 591 F. Supp. 2d 511, 519 (S.D.N.Y. 2008) (noting that employers need not prove the perceived harm "as an empirical matter"; courts may defer to professional judgment). Additionally, a government employer need not wait until harm

materializes; the employer's action is justified if it reasonably believed an employee's speech would cause a disruption. *See Pappas*, 290 F.3d at 150–51 ("[W]e have little sympathy for the suggestion that the proper course for the Police Department, upon learning that one of its officers was disseminating offensive racially bigoted materials, was to hush the matter up and hope to keep it secret."); *Sczygelski v. U.S. Custom & Border Prot. Agency*, No. 08-CV-75, 2010 WL 11449064, at *4 (D.N.D. Aug. 16, 2010) (holding that where the U.S. Custom and Border Protection Agency "could reasonably conclude that [the plaintiff's] statements [regarding the intellectual inferiority of African-Americans] would lead members of the public to mistrust the agency," the agency "was justified in firing him" (citing *Locurto*, 447 F.3d at 172)), *adopted by* 2010 WL 11449065 (D.N.D. Sept. 15, 2010), *aff'd*, 419 F. App'x 680 (8th Cir. 2011); *Lawrenz v. James*, 852 F. Supp. 986, 994 (M.D. Fla. 1994) (holding that the defendant "did not have to wait until racial tensions erupted before taking action"), *aff'd*, 46 F.3d 70 (11th Cir. 1995); *Pereira*, 432 Mass. at 262–63 (holding the plaintiff's interest in making a "racist" joke at a public event "where there is little likelihood of privacy" was outweighed by the government's concern "about the appearance of racial bias" within the Department of Social Services). Had Plaintiff expressed her views "in a private diary, or revealed them in confidence to [her] family or intimate friends, and they had become known accidentally . . . that case would present different considerations"; however, Plaintiff "deliberately sought to publicize [her] views" by posting them on the public Facebook page of a local news channel. *Pappas*, 290 F.3d at 147, 150 ("Given the nature of [the plaintiff's] statements and their very high capacity to inflict serious harm on the employer's mission . . . , the fact that [the plaintiff] acted anonymously, at home, and on his own time does not alter the ultimate conclusion that the [Police] Department

was entitled to dismiss him because of the harm to the Department that his statements risked to inflict.").

Nevertheless, at the motion-to-dismiss stage and without the benefit of discovery, the Court cannot conclude as a matter of law that Defendants terminated Plaintiff's employment because of the disruption it could cause in the workplace, rather than because of the content of the speech. *See Locurto*, 447 F.3d at 175–76 (noting that where a plaintiff's "expressive activity was the motivating factor behind" termination of their employment, "the burden is on the Government to make two showings: (1) that the employee's activity was likely to interfere with Government operations and (2) that the Government acted *in response to that likely interference and not* in retaliation for the content of the speech" (emphasis added) (citation omitted)); *see also Squicciarini v. Village of Amityville*, No. 17-CV-6768, 2019 WL 1232093, at *9 (E.D.N.Y. Mar. 15, 2019) ("[T]he *Pickering* test is a fact-sensitive inquiry and the [d]efendants bear the burden of satisfying that test. As such, a motion to dismiss is not the appropriate means to determine the balance of interests." (citation and quotation marks omitted)); *Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18-CV-67, 2018 WL 6830865, at *7 (S.D.N.Y. Dec. 28, 2018) (denying motion to dismiss First Amendment claim because a "Rule 12(b)(6) motion is not the proper means to determine the balance of interests" under *Pickering*, and noting that "[the] issue may be reviewed at summary judgment after the completion of discovery"); *Mongielo v. Smith*, No. 16-CV-891, 2017 WL 2119216, at *4 (W.D.N.Y. May 16, 2017) (finding argument based on *Pickering* balancing "premature" where the defendants' proffered rationale for suspending the plaintiff had not been "explicitly or implicitly referenced . . . as a basis for suspending [the] [p]laintiff" at the time he was suspended). Because the Court cannot determine from the facts alleged in the Complaint whether Defendants fired Plaintiff out of concern that her Facebook

post could disrupt the hospital's ability to effectively perform its important public function, rather than because of her speech's content, Plaintiff's First Amendment claim survives by the thinnest of margins.

The Court emphasizes that because Plaintiff's Facebook post "at most only minimally touch[ed] on matters of public concern . . . the government's burden, at the balancing stage, is at its lowest." *Blackman*, 491 F.3d at 99. Courts routinely find that a plaintiff's right to engage in racist off-duty speech that does not touch on any matter of public concern is outweighed by public agencies' interest in a harmonious work environment and a positive relationship with the public they serve. *See Locurto*, 447 F.3d at 180 (reversing judgment for the plaintiffs where "the evidence in the record is overwhelming that, in discharging the plaintiffs, the defendants were motivated primarily by a concern that the public, and particularly members of minority communities, would regard the NYPD and FDNY as racist"); *Pappas*, 290 F.3d at 145, 151 (holding that the plaintiff's right to anonymously distribute "offensive racially bigoted materials" was outweighed by his employer's interest "in promoting the efficiency of the public service it performs"); *Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995) (finding that because the plaintiff "has not met his burden of showing that his appearance at [a] party [wearing blackface] expressed a matter of public concern, it is not really necessary to move on to the *Pickering* balancing test, but its application weighs in favor of the police chief and the city"); *Spetalieri v. Kavanaugh*, 36 F. Supp. 2d 92, 100, 106 (N.D.N.Y. 1998) (finding that even assuming the plaintiff's off-duty speech in which he spoke "in a denigrating manner about African-Americans" touched on a matter of public concern, the "potential for disruption in the" police department "outweighs the value of [the] plaintiff's speech"); *cf. Waters*, 511 U.S. at 672 ("[W]e

have never expressed doubt that a government employer may bar its employees from using [an] offensive utterance to members of the public or to the people with whom they work.").

However, because it is Defendants' burden to establish that its interest in firing Plaintiff outweighed Plaintiff's expressive interests, and Defendants cannot meet that burden without directing the Court toward facts outside the Complaint, Plaintiff has plausibly alleged a First Amendment claim.

### 2. *Monell* Liability

Because Plaintiff has sufficiently stated a claim for First Amendment retaliation, the Court must determine whether Plaintiff has sufficiently pled municipal liability against WCHCC under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  WCHCC, which owns and maintains WMC, is a public benefit corporation created by the New York State Legislature, *see* N.Y. Pub. Auth. Law §§ 3301 & 3303, and is "not a [municipal] agency, but rather is a separate, suable entity," *Quinones v. City of New York*, No. 16-CV-985, 2017 WL 1322205, at *11 n.14 (S.D.N.Y. Jan. 6, 2017) (citation omitted), *adopted by* 2017 WL 775851 (S.D.N.Y. Feb. 28, 2017); *see also* N.Y. Pub. Auth. Law § 3305(1) (noting that WCHCC shall have the power "to sue and be sued").  WCHCC and its employees are state actors for purposes of § 1983 liability. *See Mejia v. New York City Health & Hosps. Corp.*, No. 16-CV-9706, 2018 WL 3442977, at *5 (S.D.N.Y. July 17, 2018).

"As a municipal corporation, [WCHCC] cannot be held liable under [§] 1983 pursuant to a theory of respondeat superior.  Rather, liability under [§] 1983 is governed by principles set forth in *Monell*."  *Mejia*, 2018 WL 3442977, at *12 (italics omitted); *see also Fortunato v. Liebowitz*, No. 10-CV-02681, 2012 WL 6628028, at *8 (S.D.N.Y. Dec. 20, 2012) (analyzing constitutional claims against WCHCC under *Monell*); *Matthews v. Malkus*, 377 F. Supp. 2d 350,

360 (S.D.N.Y. 2005) (dismissing claims against WMC where there was "no basis for assertion of a *Monell* claim"); *Estes–El v. N.Y.S. Dep't of Motor Vehicles Office of Admin. Adjudication Traffic Violation Bur.*, No. 95-CV-3454, 1997 WL 342481, at *4 (S.D.N.Y. June 23, 1997) (noting that the liability of a public benefit corporation under § 1983 "is governed by the principles set forth in *Monell* . . . and its progeny"); *Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) (same). "Therefore, to state a claim against [WCHCC], . . . '[P]laintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Mejia*, 2018 WL 3442977, at *12 (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff may satisfy the "policy, custom[,] or practice" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).

Plaintiff argues that she has asserted a plausible *Monell* claim because Defendant Israel, as "Chief Executive Officer and President of Westchester Medical Center," is "a municipal policymaker on personnel-related matters," and is the one who terminated Plaintiff's employment. (Pl.'s Mem. 23 (quotation marks omitted).) The Second Circuit has held that a "single unlawful discharge, if ordered by a person 'whose edicts or acts may fairly be said to represent official policy,' may support an action against the municipal corporation." *Rookard v.*

*Health and Hosps. Corp.*, 710 F.2d 41 (2d Cir. 1983) (quoting *Monell*, 436 U.S. at 694); *see also*

*Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Even one episode of illegal retaliation

may establish municipal liability under § 1983 if ordered by a person whose edicts or acts

represent official city policy." (citing *Pembaur*, 475 U.S. at 481)).  "Where a city official has

final authority over significant matters involving the exercise of discretion, his choices represent

government policy."  *Gronowski*, 424 F.3d at 296–297 (holding retaliatory termination by mayor

of city established *Monell* liability because "he has final authority over hiring and firing

decisions, which are discretionary matters"); *see also Stajic v. City of New York*, No. 16-CV-

1258, 2018 WL 4636829, at *13 (S.D.N.Y. Sept. 27, 2018) ("[M]unicipal liability may be

imposed for a single decision by municipal policymakers." (quotation marks omitted) (citing

*Pembaur*, 475 U.S. at 480)).  "Moreover, 'the official in question need not be a municipal

policymaker for all purposes. Rather, with respect to the conduct challenged, he must be

responsible under state law for making policy in that area of the municipality's business.'"

*Rodrigues v. Inc. Vill. of Mineola*, No. 16-CV-1275, 2017 WL 2616937, at *9 (E.D.N.Y. June

16, 2017) (emphasis and alteration omitted) (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.

2000)).

Plaintiff alleges that she was told Israel made the decision to terminate Plaintiff's

employment, suggesting he has final authority over hiring and firing decisions.  (Compl. ¶ 14.)

At the motion-to-dismiss stage, Plaintiff's allegation that Israel has authority over firing

decisions is sufficient to assert liability for her allegedly unlawful termination against WCHCC.

*See Dangler v. N.Y.C. Off Track Betting Corp.*, 193 F.3d 130, 143 (2d Cir. 1999) (reversing

dismissal of *Monell* retaliation claim based on actions of chief executive officer of a public

benefit corporation); *Walton v. Safir*, 122 F. Supp. 2d 466, 478 (S.D.N.Y. 2000) (holding the

plaintiff stated claim for *Monell* liability where termination decision was made by the Police Commissioner "as 'chief executive' of the Police Department," and noting that the Police Commissioner had the power "to terminate the employment of a police officer"). Defendants' Motion To Dismiss Plaintiff's claim against WCHCC is therefore denied.

### 3. Qualified Immunity

Defendants argue that even if Plaintiff successfully stated a First Amendment retaliation claim, Israel is entitled to qualified immunity. (Defs. Mem. 16–17.) Defendants fail to meaningfully apply the qualified immunity analysis to the facts of this case, and cite no case in support of their conclusory assertion that "Plaintiff cannot demonstrate that Mr. Israel violated a clearly established statutory or constitutional right." (*Id.*) In light of the Second Circuit's statement in *Locurto* that it is "sensible" to "treat off-duty, non-work-related speech as presumptively entitled to First Amendment protection regardless of whether, as a threshold matter, it may be characterized as speech on a matter of public concern," 447 F.3d at 175, and the fact that Defendants fail to meaningfully engage with the analysis, the Court denies Defendants' Motion To Dismiss claims against Israel in his individual capacity based on qualified immunity.

## III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is denied. The Court will

hold a conference on April 10, 2019 at 2:30 p.m. to discuss the status of the case. The Clerk is

respectfully directed to terminate the pending Motion, (*see* Dkt. No. 17).

SO ORDERED.

Dated: March 29, 2019
       White Plains, New York

KENNETH M. KARAS
United States District Judge